Douglas C. Erickson, No. 012130
derickson@mmcec.com
Daniel D. Maynard, No. 009211
**MAYNARD CRONIN ERICKSON**
**& CURRAN, P.L.C.**
3200 N. Central Ave., Ste. 1800
Phoenix, AZ  85012
Telephone:  (602) 279-8500
Facsimile:  (602) 263-8185

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| Harvey Winingham, an individual, | No. CV-22-01037-PHX-JJT |
|---|---|
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| v. | |
| Sig Sauer, Inc., a foreign corporation, | |
| Defendant. | |

For his First Amended Complaint against Defendant, Plaintiff alleges as follows:

**<u>GENERAL ALLEGATIONS</u>**

1. Plaintiff Harvey Winingham ("Harvey") is a resident of Maricopa County, Arizona.

2. Defendant Sig Sauer, Inc. ("Sig Sauer" or "Defendant") is a foreign corporation registered to do business in the state of Arizona.

3. At all times relevant to this civil action, Harvey was the owner of a P320 handgun, which was manufactured by Defendant.

4. Defendant designs, manufactures, markets, and sells firearms for military, law enforcement, and commercial purposes in Arizona and throughout the United States.

5. As an avid gun enthusiast, life-long gun owner, and a supporter for a citizen's Second Amendment right to bear arms, at all relevant times, Harvey legally owned a P320 handgun.

6. That gun was designed, manufactured, marketed, sold, and "upgraded" by Defendant.

7. Sig Sauer expressly represented and warranted that "[w]e've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to."

8. In marketing claims, Sig Sauer represented that the striker safety "[p]revents the striker from releasing unless the trigger is pulled."

9. At the same time, however, Sig Sauer stated in the P320 owner's manual, that the weapon may fire if dropped without the trigger being pulled if the chamber is not empty, in contradiction to its express marketing and advertising materials.

10. Upon information and belief, at the time Sig Sauer sold the P320 in question, the original design and/or manufacture of the gun was defective and rendered it unreasonably dangerous for its intended uses and for many foreseeable uses.

11. When the weapon was originally sold by Sig Sauer, it knew, or should have known, that the P320 was defective and unreasonably dangerous for its ordinary uses, intended uses, and other foreseeable uses, and that accidental discharges could occur in the ordinary course of using and carrying the weapon.

12. Upon information and belief, there had been many prior incidents of unintended discharges involving P320 guns that discharged without the trigger being

pulled, or simply while being handled, accidentally dropped, or while being holstered or unholstered.

14. On or about August 8, 2017, Sig Sauer announced a "voluntary upgrade" program for the P320, claiming that it would meet "rigorous testing protocols for global military and law enforcement agencies."

14. The upgrade program, which was presented to the public as purely optional, and not urgent or mandatory, offered to make existing commercial versions of the P320 "better" by installing a lighter trigger, an internal disconnect switch, and an improved sear to prevent accidental discharges.

15. Based on subsequent reports of additional unintentional discharges of even "upgraded" P320s, the voluntary upgrade program did not fully address the design and manufacturing defects and the weapon remained unsafe, despite Sig Sauer's repeated public protestations to the contrary.

16. When he learned of a possible problem with his P320 and the voluntary upgrade, Harvey promptly sent his gun to Sig Sauer.

17. Allegedly, the upgrade was completed and the gun was returned to Harvey.

18. On the evening of May 31, 2020, as Harvey removed the gun from its holster, without touching the trigger, a round discharged from the weapon (the "Incident").

19. The P320 fired one bullet, which entered through the back of his left hand, resulting in the loss of a finger, significant injury to the entire hand, and severe pain and suffering.

20. X-rays and medical diagnosis after the Incident show the substantial damage to his left hand, which resulted in severe trauma and acute pain.

21. The gunshot wound caused Harvey to incur substantial medical bills for medical procedures, treatment, and physical therapy sessions.

22. While the full extent of the physical damage to his hand is not yet known, it is likely that Harvey will continue to suffer enormous pain and suffering, and have trouble with basic tasks and daily living.

23. This gruesome injury will result in continuing pain and affect Harvey for the remainder of his life, both physically and emotionally.

24. At all times material hereto, upon information and belief, Sig Sauer acted with an evil mind. At a minimum, it was motivated by profit and knowingly placed its own economic interests above the safety and welfare of gun owners and the public. Alternatively, or in addition, it consciously disregarded a substantial risk that significant injuries were likely to be suffered by consumers, gun owners, and the public by virtue of its conduct.

### COUNT I
### (Negligence)

25. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 24 as though fully set forth herein.

26. At all relevant times, Sig Sauer owed the consuming public, including Plaintiff, the duty to design the P320 in such a manner and with the exercise of such reasonable care, so as to prevent it from inadvertently firing, before placing the gun into the stream of commerce. To any extent Sig Sauer did not owe this duty of care under

existing Arizona law, it assumed such a duty by virtue of its conduct and knowledge prior to the Incident.

27. At all relevant times, Sig Sauer owed the consuming public, including Plaintiff, the duty to design, manufacture, assemble, inspect and test its P320s in such a manner and with the exercise of such reasonable care, so as to prevent it from inadvertently firing before placing the gun into the stream of commerce. To any extent Sig Sauer did not owe this duty under existing Arizona law, it assumed such a duty by virtue of its conduct and knowledge prior to the Incident.

28. At all relevant times, Sig Sauer owed the consuming public, including Plaintiff, the duty to unambiguously and adequately warn consumers and/or intended users of the P320, including Harvey, of known or suspected defects that rendered the gun unreasonably dangerous to handle or use. To any extent Sig Sauer did not owe this duty under existing Arizona law, it assumed such a duty by virtue of its conduct and knowledge prior to the Incident.

29. Upon information and belief, prior to the Incident, Sig Sauer knew or had reason to know that the P320 posed an unreasonable risk of harm by virtue of numerous claims arising from similar incidents, involving unintended discharges of P320s without pulling the trigger, as well as internal testing and research, industry publications and research, and other sources of information to be sought in discovery.

30. Sig Sauer breached the above-referenced duties in one or more of the following ways:

a. By failing to use reasonable care in designing and manufacturing the P320s, so as to prevent unintentional discharges;

b. By failing to use reasonable care in designing and manufacturing the P320's internal components, including its sear, and/or by omitting a mechanical disconnect switch, so as to prevent accidental discharges;

c. By failing to issue a mandatory recall of the P320 as Sig Sauer had done in the past with other defective products, and instead announcing a "voluntary upgrade" of the weapon, which it knew to be defective and prone to accidental discharges based on all information available to it;

d. By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonably dangerous conditions relating to the gun's propensity to discharge unintentionally as described above;

e. By negligently failing to unambiguously and adequately warn purchasers and foreseeable users of the gun, including Harvey, of the aforementioned defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

f. By failing to discover the defective, hazardous and unreasonably dangerous conditions pertaining to the gun's propensity to discharge accidentally;

     g. By negligently failing to utilize adequate warnings to its consumers warning them about the possibility of accidental discharge, despite Sig Sauer knowing of several instances of such taking place;

     h. Despite knowing the danger of not doing so, in failing to undertake reasonable and/or necessary actions upon discovering that the P320s had the propensity to discharge at times unintended by the user to take action to prevent Plaintiff's injuries and damages described herein and similar incidents;

     i. By negligently attempting corrective action through a so-called "voluntary upgrade."

31. Sig Sauer knew, or should have known, that exposing users to the dangerously defective and hazardous conditions existing in the P320 would or could give rise to serious bodily injury to its consumers and users.

32. The defective condition(s) in the P320 handgun were latent and Harvey was not capable of realizing the dangerous condition, and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

33. Whether certain conditions were intended or not, the P320 failed to perform as safely as an ordinary consumer would expect.

34. As a direct and proximate result of the negligence set forth herein, Harvey suffered severe physical injury, mental anguish, inconvenience, loss of capacity for enjoyment of life, both temporary and permanent physical deformity and disability,

embarrassment, loss of earnings and earnings capacity, and incurred substantial medical, nursing, hospital, and physical therapy expenses through surgeries, care, and treatment.

## COUNT II
### (Strict Liability)

35. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 34 as though fully set forth herein.

36. At all relevant times, Sig Sauer was in the business of designing, manufacturing, marketing, selling, and distributing weapons, including the P320 that caused Plaintiff's injuries.

37. Sig Sauer's P320 was in a defective condition and unreasonably dangerous for its intended use without inadvertently discharging.

38. Upon information and belief, while Sig Sauer was in the business of selling weapons, it sold the P320, which was in a defective condition and unreasonably dangerous, and was in the same condition at the time of the Incident as it was when it left Sig Sauer's control.

39. Alternatively, or in addition, when Defendant performed a voluntary upgrade of Harvey's P320 and returned it to him, representing it to be safe and free of defects, it was, in fact, still in a defective condition and unreasonably dangerous.

40. As a direct and proximate result of the defects in the P320, Harvey suffered severe physical injury, mental anguish, inconvenience, loss of capacity for enjoyment of life, both temporary and permanent physical deformity and disability, embarrassment, loss of earnings and earnings capacity, and incurred substantial medical, nursing, hospital, and physical therapy expenses through surgeries, care, and treatment.

# COUNT III
## (Breach of Implied Warranty of Merchantability)

41. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 40 as though fully set forth herein.

42. At all times relevant, Sig Sauer was in the business of designing, manufacturing, marketing, selling, and distributing weapons, including the P320 that caused Harvey's injuries.

43. Sig Sauer knew of the ordinary purposes for which the gun was intended and impliedly warranted it to be of merchantable quality, safe, and fit for such purposes and all other reasonably foreseeable uses.

44. At all relevant times, Harvey used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment, and implied warranty of Sig Sauer.

45. Sig Sauer breached the above-referenced implied warranties as to the P320 because, at the time it left Sig Sauer's possession originally and/or after the voluntary upgrade, it was not of merchantable quality and was unreasonably dangerous and unfit for the ordinary, reasonably foreseeable purposes for which it was intended, and reasonably foreseeable misuses by, without limitation:

    a. Failing to use due care in designing and manufacturing the P320's internal components;

    b. Failing to issue a mandatory recall of the P320s as Sig Sauer had done in the past with other defective products;

    c. Failing to make reasonable tests and/or inspections to discover the defective hazardous and unreasonably dangerous conditions relating to the P320's propensity to discharge unintentionally;

    d. Negligently failing to unambiguously and adequately warn purchasers and foreseeable users of the gun, including Harvey, of the aforementioned defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

    e. Failing to discover and/or correct the defective, hazardous and unreasonably dangerous conditions pertaining to the gun's propensity to discharge accidentally;

    f. Negligently failing to utilize adequate warnings about the possibility of accidental discharge, despite Sig Sauer knowing of several instances of such taking place.

46. Harvey, as the purchaser, owner, and ultimate user of the gun, was a person who would foreseeably be injured by breach of the implied warranty referenced herein and Sig Sauer's breach of the warranty of merchantability as alleged herein directly, and said breach caused the Incident on May 31, 2020.

47. As a direct and proximate result of the breaches set forth herein, Harvey suffered severe physical injury, mental anguish, inconvenience, loss of capacity for enjoyment of life, both temporary and permanent physical deformity and disability,

embarrassment, loss of earnings and earnings capacity, and incurred substantial medical, nursing, hospital, and physical therapy expenses through surgeries, care, and treatment.

## COUNT IV
### (Breach of Warranty of Fitness for a Particular Purpose)

48. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 47 as though fully set forth herein.

49. At all times relevant, Sig Sauer was in the business of designing, manufacturing, marketing, selling, and distributing weapons, including the P320 that caused Plaintiff's injuries.

50. Upon information and belief, Sig Sauer knew or had reason to know that the gun would be stored in a holster and/or handled by its owner when it allegedly upgraded the gun for Harvey and that customers, including Harvey, would be relying on Sig Sauer's skill, judgment, and implied warranty of the gun's fitness for that particular purpose without discharging a bullet into his hand.

51. Accordingly, Sig Sauer impliedly warranted that the gun was suitable for the particular purpose of being stored in a holster and/or handled by its owner.

52. At all times relevant, Harvey used the gun in its intended manner and for its intended purpose and reasonably relied on the skill, judgment and implied warranty of Sig Sauer in using, storing, carrying, and handling the gun.

53. Sig Sauer breached the above-referenced implied warranty as to the gun in that even after its voluntary upgrade it was unreasonably dangerous and unfit to be stored in a holster or handled at the time it left Sig Sauer's possession by virtue of, without limitation:

a. Failing to use due care in designing and manufacturing the P320's internal components;

b. Failing to issue a mandatory recall of the P320s as Sig Sauer had done in the past with other defective products;

c. Failing to make reasonable tests and/or inspections to discover the defective hazardous and unreasonably dangerous conditions relating to the P320's propensity to discharge unintentionally;

d. Negligently failing to unambiguously and adequately warn purchasers and foreseeable users of the gun, including Harvey, of the aforementioned defective, hazardous and unreasonably dangerous conditions relating to its design and manufacture, which it knew or should have known through the exercise of ordinary care;

e. Failing to discover and/or correct the defective, hazardous and unreasonably dangerous conditions pertaining to the gun's propensity to discharge accidentally;

f. Negligently failing to utilize adequate warnings about the possibility of accidental discharge, despite Sig Sauer knowing of several instances of such taking place.

54.  As a direct and proximate result of the breaches set forth herein, Harvey suffered severe physical injury, mental anguish, inconvenience, loss of capacity for enjoyment of life, both temporary and permanent physical deformity and disability,

embarrassment, loss of earnings and earnings capacity, and incurred substantial medical, nursing, hospital, and physical therapy expenses through surgeries, care, and treatment.

## COUNT V
## (Breach of Express Warranty)

55.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 54 as though fully set forth herein.

56.  Sig Sauer expressly represented to all consumers, including Harvey, that it "designed safety elements into every necessary feature in this pistol.  From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to."

57.  In additional marketing, Sig Sauer further stated: that the striker safety "[p]revents the striker from releasing unless the trigger is pulled."

58.  Sig Sauer made other express warranties regarding the safety of the P320 and its reliability.

59.  Sig Sauer breached the above-referenced express warranties and others to be determined as to the P320 in that it was unreasonably dangerous and unfit to be stored or in a holster or handled by its owner, at the time it left Sig Sauer's possession originally and/or after the voluntary upgrade.

60.  As a direct and proximate result of Defendant's breaches, Harvey suffered serious injury and damages.

## COUNT VI
## (Consumer Fraud)

61.  Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 60 as though fully set forth herein.

62. Upon information and belief, Sig Sauer employed one or more deceptions, deceptive or unfair acts or practices, frauds, misrepresentations, or concealment, suppression of one or more material facts with the intent that others reply on them in connection with the sale or advertisement of the P320, in violation of A.R.S. §44-1522.

63. In particular, among other things, Sig Sauer represented that it "designed safety elements into every necessary feature in this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to."

64. It further represented to the public that the striker safety "[p]revents the striker from releasing unless the trigger is pulled."

65. In fact, Sig Sauer was aware before it started marketing and selling the P320 to the public that these statements were false.

66. Sig Sauer knew the statements to be false because its own internal testing had shown that the P320 could discharge without a trigger pull.

67. Sig Sauer continued to represent that the P320 would not discharge without a trigger pull following the "voluntary upgrade."

68. Those representations were also false.

69. Upon information and belief, Sig Sauer knew or should have known they were false, but continued to make them intending that the public would rely on them.

70. In the absence of Sig Sauer's representations, deceptions, and or concealments and suppression concerning the P320's safety, Harvey would not have purchased, owned, or carried a P320.

71. Thus, Harvey was injured as a result of Sig Sauer's consumer fraud, as described above.

## COUNT VII
### (Common Law Fraud)

72. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 71 as though fully set forth herein.

73. Upon information and belief, Sig Sauer made the foregoing statements and representations knowing them to be false, or alternatively, with reckless disregard for the truth and accuracy of the statements and representations.

74. The statements and misrepresentations were material.

75. Sig Sauer made them with the intention that consumers, such as Harvey, would rely on the statements and malpresentations.

76. Harvey had no knowledge that the statements and representations were false and he justifiably relied upon them in deciding to acquire the P320 for himself and later in allowing Sig Sauer to perform an "upgrade" on the gun.

77. As a direct and proximate result, Harvey suffered significant injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered in his favor and against Defendant, as follows:

A. For an award of compensatory damages in an amount to be determined at trial;

B. For an award of punitive damages in an amount to be determined at trial;

C. Such other and further relief as the Court deems just and proper.

1  Plaintiff hereby demands a jury trial.

2  DATED this 16th day of February, 2023.

**MAYNARD CRONIN ERICKSON & CURRAN, P.L.C.**

By   /s/Douglas C. Erickson
Douglas C. Erickson
3200 North Central Avenue, Ste. 1800
Phoenix, Arizona 85012
Attorneys for Plaintiff

ORIGINAL of the foregoing served via electronic service through the U.S. District Court of Arizona's ECF System this 16th day of February, 2023, to:

Jodi L. Mullis
jlmullis@wshblaw.com
Taila K. Lewis
tklewis@wshblaw.com
Wood, Smith, Henning & Berman LLP
Attorneys for Defendant

Brian Keith Gibson
Keith.gibson@littletonpark.com
Ericka A. Esposito
Ericka.esposito@littletonpark.com
Littleton Park
Attorneys for Defendant


By: /s/ Deb Czajkowski