**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Harvey Winingham, | No. CV-22-01037-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Sig Sauer Incorporated, | |
| Defendant. | |

At issue is the admissibility of expert testimony provided by Dr. David Bosch on behalf of Plaintiff Harvey Winingham. The Court considers Defendant's Motion to Preclude the Evidence and Opinions of Plaintiff's Expert, David Bosch (Doc. 70, Mot.), Plaintiff's Response (Doc. 76, Resp.), and Defendant's Reply (Doc. 82, Reply). The Court finds this matter appropriate for decision without oral argument. *See* LRCiv 7.2(f).

**I.    BACKGROUND**

    **A.    Brief Summary of Facts**

Plaintiff suffered an accidental gunshot wound in his home on the evening of May 31, 2020. (Doc. 1, Ex. A, Compl. ¶ 21.) The wound resulted from a single unintended discharge of Plaintiff's personally owned firearm, a Sig Sauer P320. (Compl. ¶ 22.) Plaintiff had just arrived home when he decided to check whether his pistol was loaded. He removed the pistol from its holster, partially retracted the slide, and then rested it on his belly while he reclined in his armchair. (Doc. 70, Ex. A, Winingham Dep. at 81:8–16, 86:3-88:3.) According to Plaintiff, the P320 suddenly discharged, without any trigger

1  movement, sending a bullet through the back of his left hand. (Compl. ¶ 21.) The wound
2  resulted in the loss of a finger, injury to the entire hand, and severe pain and suffering.
3  (Compl. ¶ 22.)

4        Plaintiff alleges, among other things, that the Sig Sauer P320 model pistol used by
5  him at the time of the accident was defective because it discharged without a trigger pull.
6  Plaintiff has alleged that Defendant Sig Sauer, Inc. bears responsibility for the design,
7  manufacture, and distribution of the subject firearm.

8        **B.**      **Expert Witness David Bosch**

9        David Bosch, Ph. D., a forensic engineer, wrote two reports for Plaintiff. For his
10 initial report (Doc. 70, Ex. B, Bosch Report), dated June 29, 2023, Dr. Bosch relied on his
11 own experience and expectations as a gun owner, Plaintiff's alleged version of the facts,
12 various public records purporting to report on unintended discharges of the P320, and
13 statements by Defendant. (Bosch Report at 1–15.) Dr. Bosch did not attempt any testing to
14 replicate an unintended P320 discharge, but he engaged in "basic manipulation of the pistol
15 . . . to ensure that [Plaintiff's P320] was functioning as Sig Sauer intended it to function."
16 (Doc. 70, Ex. D, Bosch Dep. at 11:2–15.) Based on his research, Dr. Bosch found the P320
17 generally to function properly, but he reached three primary conclusions that, according to
18 Plaintiff, are "front and center for purposes of the motion[]." (Resp. at 5.)

19       Those three conclusions are: (1) If Plaintiff's pistol discharged without *any* trigger
20 contact, then the P320 is unreasonably dangerous, (2) if Plaintiff's pistol discharged with
21 *minimal* trigger contact, then the P320 is unreasonably dangerous, and (3) independent of
22 the first two conclusions, the P320 is unreasonably dangerous because it has no manual
23 safety. (Resp. at 5.) The Bosch Report noted that "the root cause and/or causes of the
24 uncommanded discharges in at least some cases remains unknown," but Dr. Bosch opined
25 that "[t]he Sig Sauer P320 will remain unreasonably dangerous until the cause of the
26
27
28

uncommanded discharges is eliminated and/or a manual safety is included as a standard feature." (Bosch Report at 27, 32.)

Dr. Bosch wrote a second report on September 15, 2023, to rebut the opinions of Defendant's expert witness—Mr. Derek Watkins. (Doc. 70, Ex. C, Bosch Rebuttal.) While writing his rebuttal report, Dr. Bosch reviewed his initial report, new public records, and the new expert witness opinions and report. In his rebuttal report, Dr. Bosch took issue with Mr. Watkins's representation that Dr. Bosch's conclusions were improper due to lack of experimentation via the scientific method. The Bosch Rebuttal defends its opinions by suggesting that "deductive reasoning . . . is generally and widely accepted in the field of engineering, [so] the facts demonstrate that it is more likely than not that a defect does exist but occurs too irregularly to be identified and/or quantified." (Busch Rebuttal at 5–6.)

## II.     LEGAL STANDARD

Under Federal Rule of Evidence 702, an expert may testify on the basis of "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence," provided the testimony rests on "sufficient facts or data" and "reliable principles and methods," and "the witness has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d). The trial judge acts as the "gatekeeper" of expert witness testimony by engaging in a two-part analysis. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 592 (1993). First, the trial judge must determine that the proposed expert witness testimony is based on scientific, technical, or other specialized knowledge. *Id.*; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Second, the trial court must ensure that the proposed testimony is relevant—that it "will assist the trier of fact to understand or determine a fact in issue." *Id.* "Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." Fed. R. Evid. 401.

"The inquiry envisioned by Rule 702" is "a flexible one." *Daubert*, 509 U.S. at 594. "The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* The advisory committee notes on the 2000 amendments to Rule 702

explain that Rule 702 (as amended in response to *Daubert*) "is not intended to provide an excuse for an automatic challenge to the testimony of every expert." *See Kumho Tire*, 526 U.S. at 152. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595 (citation omitted).

**III.   ANALYSIS**

Defendant argues that Dr. Bosch should be excluded from testifying at trial, and it advances that argument by individually challenging three of his opinions. Defendant first argues that Dr. Bosch's opinion that the P320 may have a design defect causing discharges without a trigger pull will not assist the trier of fact. (Mot. at 11.) Defendant then argues that Dr. Bosch's opinion that the P320 is unsafe without an external safety is not relevant to the claims in this case. (Mot. at 13.) Finally, Defendant argues that Dr. Bosch's opinions relating to "warnings" are neither reliable nor relevant. (Mot. at 14.) Plaintiff responds by arguing that Dr. Bosch's opinions are indeed reliable notwithstanding the absence of any testing or measurements. (Resp. at 5.)

The Court begins by noting that the parties' arguments confuse the issues of relevance and reliability. Although "ruling on the admissibility of expert scientific testimony" is sometimes a "complex and daunting task," dividing the inquiry into its two prongs can help clarify that task. *Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"). The Court, therefore, steps back to first principles to delineate the border between the prongs.

For scientific evidence to be reliable, "the principles and methodology used by the expert" must be "grounded in the methods of science." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). In *Daubert*, the Supreme Court established a non-exhaustive list of factors to weigh in making that determination: (1) whether the scientific theory or technique can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific

community. *Daubert*, 509 U.S. at 593–94. On remand, the Ninth Circuit in *Daubert II* added that an expert who has not conducted his own research independent of the litigation must provide "objective, verifiable evidence that the testimony is based on 'scientifically valid principles.'" *Daubert II*, 43 F.3d at 1317–18. This test of reliability is not about "the correctness of the expert's conclusions but the soundness of his methodology." *Id.* at 1318.

As for the second prong, scientific evidence is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This "helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591–92. Though expert testimony "need not establish every element that the plaintiff must prove," it must be "relevant to the task at hand." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quoting *Daubert*, 509 U.S. at 597).

Clearly defining these prongs is a critical first step in analyzing an expert's admissibility, but it is a first step that is missing from Defendant's Motion. Indeed, Defendant frames its lead argument by challenging the possibility that Dr. Bosch's opinion that the P320 has a design defect "will . . . assist the trier of fact," (Mot. at 11), a requirement that "goes primarily to relevance." *Primiano*, 598 F.3d at 564 (internal quotations and citation omitted). However, the Court interprets the essence of Defendant's argument as an attack on the *reliability* of Dr. Bosch's testimony. This is because Defendant challenges the assumptions that Dr. Bosch relied on, Dr. Bosch's failure to ground his opinions "in any methodology of science," and Dr. Bosch's "vague, speculatory assertions." (Mot. at 12–13.) These types of challenges are the hallmark of an argument rooted in the reliability prong.

For his part, Plaintiff accepts this reliability challenge head-on, defending Dr. Bosch's open-source, internet-based methodology and his reliance on other events factually similar to Plaintiff's. (Resp. at 6–7.) Plaintiff also avers that "Dr. Bosch's opinion that the P320 is unreasonably dangerous without a manual safety" is not "unreliable." (Resp. at 7.) Therefore, the Court first addresses the reliability of Dr. Bosch's testimony,

- 5 -

and it need go no further than that to conclude that Dr. Bosch's testimony should be excluded.

Dr. Bosch opined in this case "that it is more likely than not that a defect does exist" in the P320. (Bosch Rebuttal at 7.) To reach that opinion, Dr. Bosch conducted "basic manipulation of the pistol," which included running the pistol "through its basic functions to ensure that it was functioning as Sig Sauer intended it to function." (Bosch Dep. at 11:2-15.) Those basic manipulations revealed no defects, leading Dr. Bosch to note that the pistol "functioned as designed." (Bosch Report at 16.) Dr. Bosch conducted no additional testing, never firing a live round and never "replicat[ing] any P320 discharging without a trigger pull." (Bosch Dep. at 13:2–3.)

Other than those basic manipulations, Dr. Bosch relies exclusively on the "deduction of context" to settle on his opinions. (Bosch Dep. at 114:22–23.) He was unable to identify any specific defect in the P320 that would allow it to fire without a trigger pull, only concluding that a defect is likely to exist based on Plaintiff's testimony and other examples of uncommanded P320 discharges. (Bosch Report at 155:25–156:4.) When asked in his deposition to describe the scientific method he used, Dr. Bosch replied only that "[he] gathered some other information and used that information to evaluate various scenarios along with what was the most probable cause." (Bosch Dep. at 112:13–21.)

This description of Dr. Bosch's scientific method falls short of meeting the reliability standard under *Daubert*. Though Plaintiff is correct that *Daubert* did not establish an exhaustive list of factors to consider, the *Daubert* factors remain informative in ensuring that "[p]roposed testimony . . . be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. Here, Dr. Bosch has no scientific basis upon which to ground his testimony.

The primary fault in Dr. Bosch's proposed testimony is that he has conducted no testing of the P320 beyond basic manipulation. This fails the first of the four *Daubert* factors. Hands-on testing is by no means an "absolute prerequisite," but where the theory "easily lends itself to testing and substantiation[,] . . . conclusions based only on personal

opinion and experience do not suffice." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001). The testability of one's theory is particularly important because "[t]estability assures the opponent of proffered evidence the possibility of meaningful cross-examination" such that the theory is falsifiable. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014). Plaintiff's attempt to salvage Dr. Bosch's testimony by focusing on Defendant's ability to rigorously cross-examine him is of no moment where he has not rooted his theories in a falsifiable methodology.

This lack of testing renders the remaining *Daubert* factors mostly inapplicable. Dr. Bosch's theory cannot be subject to meaningful peer review because there is no underlying scientific method to critique. Nor can there be a known or potential error rate for tests that were not conducted. And Dr. Bosch did not rely on any materials that demonstrate that the scientific community has generally accepted his theory. Instead, Dr. Bosch merely relied on "the many other reports of . . . unwanted discharges of P320s." (Bosch Dep. 8:25–9:1.) Taking notice of "newspaper articles and a few anecdotal examples" is not enough to yield reliable scientific methods. *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1006 (9th Cir. 2001). In this case, without testing, "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Citing *Oracle Corp. v. SAP AG*, 765 F.3d 1081 (9th Cir. 2014), Plaintiff argues that the data Dr. Bosch relied upon, including data gathered from internet sources, is not inappropriate. (Resp. at 6–7.) Though the Court agrees that gathering information from the internet does not inherently make an expert's opinions unreliable, a gap still remains between Dr. Bosch's data and opinions. The expert in *Oracle* relied on the internet to conduct market research, a task fitting in that case for him to opine on consumer behavior. *Oracle*, 765 F.3d at 1095. But here, Plaintiff does not explain how Dr. Bosch's internet search and his resulting "opinion reflect[] a reliable application of [his] principles and methods to the facts of the case." Fed. R. Evid. 702(d). Dr. Bosch's methodology does not apply his data "in a manner that is beyond what a typical layperson could do." *See United*

1  *States v. Shih*, 73 F.4th 1077, 1099 (9th Cir. 2023). Performing tests on the P320 could
2  have filled the analytical gap, but Dr. Bosch's testimony, as it stands, connects his opinion
3  evidence "to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146.

4        Defendant points to similar lawsuits where other courts have excluded expert
5  testimony. *See, e.g.*, *Jinn v. Sig Sauer, Inc.*, 20 Civ. 1122 (PGG) (RWL), 2023 WL 5972507
6  (S.D.N.Y. Sept. 13, 2023); *Hilton v. Sig Sauer, Inc.*, No. 1:21-cv-00441, ECF 65 (E.D.
7  Tex. June 8, 2023). Particularly apposite to the Motion here is *Mayes v. Sig Sauer, Inc.*,
8  NO. 1:19-CV-00146-GNS-HBB, 2023 WL 2730264 (W.D. Ky. Mar. 30, 2023). In *Mayes*,
9  the defendant moved to exclude two of the plaintiff's proffered experts, both of whom
10 identified five allegedly defective conditions in the P320. *Mayes*, at *7. Neither expert
11 conducted any "physical testing to replicate a P320 discharge" or did any other "testing to
12 support their theories." *Id.*

13       The court held that the testimony of both experts was unreliable because the experts
14 failed to "demonstrate that their theories have some empirical evidence to support the
15 assertion that the alleged defects have been found to cause uncommanded discharges." *Id.*
16 at *8. The plaintiff argued that "the *Daubert* factors are not stringent, and any testing would
17 be too dangerous for the experts to conduct." *Id.* But the court rejected that argument by
18 noting that the defendant itself had conducted vibration testing and that drop testing was
19 another viable alternative. *Id.* The experts' theories, then, were unreliable "conjecture and
20 speculation." *Id.*

21       Dr. Bosch's testimony fails for the same reasons. He has not conducted any testing
22 to support his theory and he acknowledges that Defendant conducted vibration testing of
23 its own. (Bosch Dep. 79:20–80:8.) As in *Mayes*, it may not be an inexorable command that
24 the expert conduct testing, but the lack of testing indicates the lack of a falsifiable
25 methodology. *See City of Pomona*, 750 F.3d at 1046. Further, Dr. Bosch has not proffered
26 a concrete theory as to why the P320 may be defective, unlike the experts in *Mayes* who
27 suggested five possible defects. The analytical gap is simply too large for Plaintiff to
28 overcome. For that reason, Dr. Bosch's testimony must be excluded.

Moreover, the unreliable nature of Dr. Bosch's methodology applies equally to all of his asserted theories. The parties quibble over whether Dr. Bosch's "alternative theory"—the possibility that slight trigger movement, as opposed to no trigger movement, resulted in the inadvertent discharge of the P320—is relevant to Plaintiff's claims as alleged in the Complaint. However, like Dr. Bosch's methodology for his primary theory, he conducted no testing to verify the "alternative theory," and again relied exclusively on "deductive reasoning" to reach his conclusions. Because his "alternative theory" went no further than "what a typical layperson could do," the "alternative theory" must also be excluded. *Shih*, 73 F.4th at 1099.

In any event, the Court would also exclude Dr. Bosch's "alternative theory" under Federal Rule of Civil Procedure 26(a)(2)(B)(i), which requires expert reports to contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Dr. Bosch admitted in his deposition, taken after he submitted both his initial report and his rebuttal report, that the "alternative theory" "was something that [he] became aware of after both reports were written and published." (Bosch Dep. at 9:17–18.) Further, even by the time of his deposition, Dr. Bosch had not "fully analyzed [the theory] to determine whether it has any impact on this case." (Bosch Dep. at 10:15–18.) Because Plaintiff "fail[ed] to provide information . . . as required by Rule 26(a)"—that is, a complete statement of his opinions and reasons for them—he is precluded from using opinion evidence relating to the "alternative theory" to support the Motion. Fed. R. Civ. P. 37(c)(1); *see Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

Finally, Dr. Bosch's opinions related to inadequate warnings must also be excluded. Dr. Bosch did not offer any specific warnings that should have been given nor did he provide any sort of analysis on that issue. (Bosch Dep. at 103:12–104:4.) Where an expert "offer[s] no factual basis, analytical framework, or reasoning process for the conclusions he has reached," his opinion should be excluded. *Worthington v. Wal-Mart Stores, Inc.*, 257 F. Supp. 2d 1339, 1344 (D. Kan. 2003).

**IT IS THEREFORE ORDERED** granting Defendant's Motion to Preclude the Evidence and Opinions of Plaintiff's Expert, David Bosch (Doc. 70).

Dated this 17th day of April, 2024.

_____
Honorable John J. Tuchi
United States District Judge